UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                       **REPORT AND**
                                                                       **RECOMMENDATION**
                -against-                                             CR 21-152 (JMA)(AYS)

JASON GABRIEL,
                        Defendant.
----------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

       Defendant, Jason Gabriel ("Gabriel" or "Defendant"), is charged in an indictment dated March 23, 2021, with the knowing receipt and possession of child pornography. (Docket Entry ("DE") [1].) On May 31, 2022, Gabriel moved, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, to suppress statements he made during the execution of a search warrant (the "Warrant"). (DE [19].) The Warrant was executed on November 19, 2020, approximately four months prior to Gabriel's indictment and arrest. It authorized the search of a residence located at 29 Wilmot Turn, Coram, New York (the "Residence"). (Transcript of Suppression Hearing dated Oct. 27, 2022 ("Tr.") Tr. 12; Hearing Exs. ("HX") 8, 20 (photographs of the Residence).) At the time of execution of the Warrant, Gabriel lived at the Residence along with his father, his father's fianceé (who owned the Residence) and his aunt.

       On July 12, 2022, the Honorable Joan M. Azrack referred Defendant's motion to this Court to hold a suppression hearing and to thereafter issue a Report and Recommendation as to whether the motion should be granted. The suppression hearing was held on October 27, 2022. Post-hearing submissions were filed on January 31, 2023. Upon review of the testimony at the hearing, the parties' submissions, and for the reasons set forth below, this Court respectfully recommends that the motion to suppress be denied.

1

FACTS

The recitation of facts set forth below is in accord with both Rule 12(c) of the Federal Rule of Criminal Procedure, which requires that "essential findings" be stated on the record, and 28 U.S.C. §636(b)(1)(B), which requires that this Court submit proposed findings of fact to the District Court. See Fed. R. Crim. P. 12(c); 28 U.S.C. §636 (b)(1)(B).

I.   Witnesses Who Testified at the Hearing

Three witnesses testified at the hearing. Suffolk County Police Department ("SCPD") Detectives Joseph Gonzales ("Detective Gonzales" or "Gonzales") and Jason Bishop ("Detective Bishop" or "Bishop") testified on behalf of the Government. Defendant's father, Roy Gabriel, who was present at the execution of the Warrant, testified for the defense. While Defendant Gabriel did not testify at the hearing, he did submit a pre-hearing declaration.

   A.   Detective Gonzales

Detective Gonzales has worked for the SCPD since 2013 and has held the rank of Detective since 2019. (Tr. 3.) At all relevant times, Gonzales was a member of the New York State Internet Crimes Against Children ("ICAC") Task Force. In that capacity, Gonzales receives tips for investigation of possible child pornography. (Tr. 4.) During the course of his career, Gonzales has participated in the execution of dozens of search warrants. (Tr. 5.) He testified as to general procedures followed in connection with the execution of search warrants as well as the execution of the Warrant herein. Gonzales testified that initial entry to premises to be searched is typically made by the SCPD Emergency Services Unit (the "ESU"). Gonzales described the entry made by the ESU as a "tactical" or "dynamic" entry. He defined "dynamic" entry as breaking into a door or prying it open. (Tr. 47.) Tactical gear used by the ESU includes helmets and tactical vests. (Tr. 47.) The ESU enters premises to be searched to secure the safe entry of

those charged with carrying out a search and to prevent destruction of evidence. (Tr. 6.) Upon gaining entry, members of the ESU typically use handcuffs to restrain all individuals encountered. (Tr. 6.)

After testifying as to general search warrant procedures, Gonzales testified as to the November 19, 2020 execution of the Warrant at the Residence. (Tr. 12.) The Warrant was a "no knock" warrant, which did not require that law enforcement give notice to occupants of the Residence prior to entry. (Tr. 45-46.) Probable cause for issuance of the Warrant, which is not challenged, was based upon Detective Gonzales's affidavit. (Tr. 45.) When the Warrant was obtained, Gonzales knew that Gabriel lived at the Residence and that he was a Level Three Sex Offender. (Tr. 13.) Gonzales also knew of two other individuals associated with the Residence. Those individuals were Roy Gabriel and Elizabeth Bowden, the owner of the Residence. (Tr. 44.) Gonzales knew that Roy Gabriel had a criminal history – a prior arrest for assault. (Tr. 44.) While police knew of Roy Gabriel's criminal history, Gonzales considered only Jason Gabriel to be a suspect. (Tr. 61.) There was no evidence that anyone living at the Residence had a licensed firearm. (Tr. 53.) At the time of execution of the Warrant, Gonzales did not have a warrant for Gabriel's arrest and did not plan on arresting him. (Tr. 12-13.)

At approximately 5:30 A.M. on the morning of the planned execution of the Warrant, a team of Suffolk County law enforcement members met at the nearby Terryville Fire Station to review their plan. (Tr. 13.) Gonzales and Bishop were present at the meeting, as were members of the ESU, the computer crimes unit, K-9's (animals trained to sniff out electronic devices), and SCPD patrol officers. (Tr. 13, 50.) Gonzales traveled to the Residence with the ESU, but was not a member of the entry team. Accordingly, upon arrival at the Residence, Gonzales exited the ESU vehicle and remained outside of the house, waiting for notice that it was safe to enter. (Tr.

3

13.) While he heard the ESU announce themselves, Gonzales did not see how that team gained entry to the Residence. (Tr. 57.) Gonzales's partner, Detective Kromer, took his vehicle to the Residence. Kromer arrived before the ESU, but remained outside of the Residence, conducting surveillance. The search began at approximately 6:50 A.M. when the ESU entered the Residence. (Tr. 14, 56.)

Once he received the "all clear" signal from the ESU, which took place between five and ten minutes after their entry, (Tr. 59), Gonzales entered the Residence and proceeded to one of the front bedrooms. (Tr. 15.) Kromer remained in his vehicle. Upon entry, Gonzales encountered Gabriel in a front bedroom in handcuffs. (Tr. 15.) Gonzales removed Gabriel's handcuffs and asked him to leave the house to talk to him. (Tr. 16-17.) Gabriel exited with Gonzales while other officers conducted the search. (Tr. 16.) Gonzales described Gabriel as being dressed in sleepwear. Gabriel attempted to get dressed, but Gonzales told him that he was not being arrested and asked that he accompany him to the car for a quick talk. (Tr. 16.) Gabriel accompanied Gonzales out of the Residence to Kromer's police vehicle which was parked in the driveway. (Tr. 16-17, 25.) When he asked Gabriel to leave the Residence with him, Gonzales did not have his gun drawn. He testified that Gabriel did not appear to be under any distress at the time. (Tr. 17.) Gabriel was the only person at the Residence who was taken outside to speak with Gonzales. (Tr. 61.) The search pursuant to the Warrant did not begin until Gabriel left the Residence with Gonzales. (Tr. 65.)

Gabriel entered Kromer's police car at approximately 7:00 to 7:15 a.m. and was placed in the rear passenger seat. (Tr. 67, 70.) Detective Kromer was in the front seat and Gonzales sat in the back with Gabriel. (Tr. 18, 66.) Immediately upon their entry into the vehicle, Gonzales read Gabriel his rights. (Tr. 18, 67.) The rights were read from a form, which Gonzales gave Gabriel

4

to read (the "Advice of Rights Form"). The Advice of Rights Form is a two-page document that was entered into evidence at the hearing as Exhibit 1. (Tr. 26; HX 1.) Gonzales observed Gabriel read the Advice of Rights Form and write his initials next to each enumerated right. (Tr. 18-19, 27-29; HX 1.) In addition to placing his initials next to each enumerated right on the Advice of Rights Form (including the rights to remain silent, an explanation as to the use of statements, the rights to speak to an attorney, have an attorney appointed and to have an attorney present during questioning), Gabriel signed a section entitled "Waiver of Rights." Gabriel wrote "yes" next to the question asking whether he understood his rights, as explained to him. (Tr. 29; HX 1.) Gabriel also answered "yes" on the form in response to the question: "having these rights in mind, do you wish to talk to me now?" (Tr. 30; HX 1.)

After Gabriel signed the Advice of Rights Form, Gonzales began to speak with Gabriel. (Tr. 19.) Gonzales showed Gabriel images of child pornography that he received as part of the information that led to his application for the Warrant. (HX 2-5; Tr. 30-31, 33, 43.) At first, Gabriel denied that such images were connected to him. (Tr. 19.) As the search of the Residence progressed, Kromer (who periodically stepped out of the car) updated Gonzales as to the progress of the search. These updates referred to devices found, including cell phones that were hidden in a bathroom adjoining Gabriel's bedroom. (Tr. 19-20, 68.) Gonzales told Gabriel of these findings. In particular, officers searching the Residence found four or five cellphones, a tablet and external SD cards. (Tr. 71.) The officers did not seize every device in the Residence, but instead focused on those devices that were located in or around the bedroom where Gabriel was found, and its adjoining bathroom. (Tr. 71-73.) When Gabriel denied that the devices found were his, Gonzales told him that the devices contained pornographic images of children. He further advised Gabriel that, while they would rather keep the matter "quiet," and did not want to

5

involve family members, police would have to question all members of the household to find out who owned the devices. (Tr. 20, 68-69.) Once he was advised of such possible next steps, Gabriel told Gonzales that the devices were his, at which point Gonzales showed the child pornography images to Gabriel. (Tr. 20, 70.) Gabriel told Gonzales that he received the images through the "Kik" messaging app. (Tr. 34.) Gabriel complied with the request that he write the source of each image on the copies of the images provided by Gonzales. (Tr. 21, 31-32, 34-35, 74; HX 2-5.)

In addition to the specific enumeration of rights and written agreement to speak with Gonzales, the Advice of Rights Form contains a summary of Gabriel's conversation with Gonzales. That summary was written by Gonzales and contains the sum and substance of his conversation with Gabriel. (Tr. 35-36, 76.) After writing the summary, Gonzales showed it to Gabriel for his review. The summary contains two "cross-outs" – one made by Gonzales and one made by Gabriel. Both were initialed by Gabriel. (Tr. 37-38.) Neither of these edits changes the substance of the summary, which sets forth the information provided by Gabriel to Gonzales as discussed above. Gabriel placed his initials under the summary where the Advice of Rights Form states "I have read this statement consisting of two pages, and I swear it is true and accurate." (HX 1; Tr. 38-39.) In addition to the material above, the Advice of Rights Form states that false statements are punishable as misdemeanors under the New York State Penal Law. (Tr. 37.) Gabriel signed the form next to that statement. (Tr. 38-39.) As noted, Detective Kromer was also in the police vehicle during the questioning of Gabriel by Gonzales. Kromer signed the Advice of Rights Form as a witness thereto. (Tr. 39-40.) The time stated next to the witness signature is 8:45 a.m. (Tr. 40.) The form indicates that Gabriel signed shortly thereafter, at 8:46 a.m.

6

As evidenced by the testimony and the Advice of Rights Form, Gonzales finished speaking with Gabriel at approximately 8:45 a.m. (Tr. 21, 40.) Thus, the interview in the police vehicle, which, according to Gonzales, began between 7:00 and 7:15 a.m., lasted approximately one and one-half hours. (Tr. 40.) Gonzales testified that he never prevented Gabriel from using the restroom during the interview, and that neither he nor any other officer he observed drew a weapon on Gabriel. (Tr. 40.) Gonzales knew that Detective Bishop was waiting to speak with Gabriel and, after completing his questioning of Gabriel, Gonzales waved Bishop over, handing the questioning of Gabriel over to Bishop. (Tr. 21.) Gonzales remained in or around his car while Bishop spoke with Gabriel. (Tr. 41.) As noted, Gonzales did not have a warrant for Gabriel's arrest. While he eventually took part in the arrest of Gabriel, Gonzales neither intended to, nor did he, arrest Gabriel on the day that the Warrant was executed. (Tr. 40-41.) Gonzales agreed that arrests are typically not made during execution of search warrants so that officers have the opportunity to build a rapport with a subject, encouraging them to speak with officers. (Tr. 60.)

  B. <u>Detective Bishop</u>

At the time of the hearing, Bishop had been employed by the SCPD for seventeen years. He is currently a detective working in the Special Victims Unit. (Tr. 78.) In that capacity, Bishop investigates allegations of abuse against children and monitors the Sex Offender Registry. (Tr. 79.) The Sex Offender Registry is maintained by the State of New York pursuant to the Sex Offender Registration Act ("SORA"). (Tr. 79.) Detective Bishop became aware of Jason Gabriel because he is subject to SORA registration requirements. (Tr. 81.) Detective Gonzales made Bishop aware of an investigation undertaken by the Computer Crimes Unit into child pornography. Bishop conducted his own investigation based upon information provided by Gonzales, submitting a request to the Division of Criminal Justice Services, identifying the

7

internet identifiers permitted to be used by Gabriel. (Tr. 81-82.) His investigation began on or about July 9, 2020 – approximately three weeks prior to execution of the Warrant. (Tr. 94.)

While Bishop was aware of the Warrant, he knew of no plan to arrest Gabriel, but planned on interviewing him. (Tr. 82.) Bishop was outside of the Residence on the day the Warrant was executed, having arrived there in a car separate from the vehicle used by the ESU. (Tr. 83.) At some point after 6:50 a.m., Bishop observed Gabriel exit the Residence. Bishop corroborated Gonzales's testimony as to Gabriel's appearance, stating that he did not appear to be distressed and was not handcuffed. Bishop also testified that no one was yelling, and no guns were drawn. (Tr. 83.)

Bishop never entered the Residence, instead remaining in or around his parked vehicle in front of the Residence. After Gabriel spoke with Gonzales, Gonzales walked Gabriel over to Bishop's car, which was parked nearby – seconds – away. (Tr. 84, 86-87.) Bishop began his conversation with Gabriel directly after Gonzales completed his interview, at approximately 8:50 a.m., and finished the interview approximately ten minutes later. (Tr. 86, 93.) Prior to their discussion, Bishop asked Gabriel if he could speak with him and advised Gabriel of his Miranda rights. (Tr. 84.) As Gabriel approached Bishop's vehicle, he was not handcuffed, no guns were drawn, and Bishop did not threaten Gabriel in any way. (Tr. 84.) Like the interview with Gonzales, Bishop asked Gabriel to review and sign a pre-printed "Advice of Rights" form (the "Second Advice of Rights Form"). (Tr. 85; HX 6.) Gabriel placed his initials next to each right enumerated therein. (Tr. 85, 88; HX 6.) He acknowledged each right and then executed the waiver of his rights. (Tr. 88-89; HX 6.)

After Gabriel signed the Second Advice of Rights Form, Bishop showed him a printout showing email addresses and Kik messenger accounts. (Tr. 85; HX 7.) The printout was obtained

8

by Gonzales and provided to Bishop on the day that the Warrant was executed. (Tr. 95.) The printout shows identifiers for the Kik messenger accounts and email addresses associated with the account. (Tr. 91.) The identifiers in the printout (HX 7) were not registered as used by Gabriel. (Tr. 92, 96.) However, when questioned, Gabriel reviewed the printout, signed it and placed his initials next to the accounts, identifying them as belonging to him. (Tr. 85. 92; HX 7.) Bishop summarized his conversation with Gabriel on the Second Advice of Rights Form. (Tr. 86, 92-93; HX 6.) Gabriel reviewed, initialed and signed the summary contained therein. (Tr. 93.) The form was witnessed by Bishop's partner, Detective Pace. (Tr. 93.)

      C.      <u>Roy Gabriel</u>

Roy Gabriel ("Roy"), Defendant's father, was present at the Residence during execution of the Warrant. He testified for the defense. At the time of execution of the Warrant, Roy lived at the Residence, which was owned by Bowden, his fiancée. (Tr. 104.) Along with Gabriel, Roy, and Bowden, Roy's sister Karen (who now resides in a nursing home) lived at the Residence at the time of execution of the Warrant. (Tr. 106.) Roy has a criminal history. He was convicted of a felony in 1984 and served eight years in prison in connection therewith. (Tr. 105.) He was thereafter on parole with respect to that conviction, and never had any violations of parole. (Tr. 106.) In 2005, Roy was convicted of attempted assault. (Tr. 118.)

Roy confirmed Gonzales's testimony as to the ESU time of entry into Residence as shortly before 7:00 a.m. (Tr. 108.) He heard a bang on the door, which flew open. Men wearing helmets ran into the Residence. Roy stated that one of the men grabbed him by the throat, picked him up and slammed him to the ground. (Tr. 108.) He further stated that they then grabbed him, twisted his arms around his back and handcuffed him. Roy remained handcuffed for an estimated twenty minutes. (Tr. 111.) He told members of the ESU that he was disabled, and asked "what

the hell is going on here?" (Tr. 108.) He stated that, in response, he was told to "Shut the F up" and was forcibly thrown on to the couch. (Tr. 108, 111.) He described feeling violated by the sudden entry of ESU into the Residence. (Tr. 111.) While Roy was in the den with four members of law enforcement, he estimates that there might have been ten or fifteen others in the Residence during execution of the Warrant. (Tr. 111.) While he certainly felt violated, no guns were drawn and he was not threatened. (Tr. 111.)

From his vantage point on the couch, Roy saw his sister Karen being dragged down the hallway of the Residence, and thereafter sitting in the dining room with Bowden. (Tr. 108-09.) Roy heard someone say that one of the dogs in the house bit someone and Bowden saying that if the dog was dead, someone was "going to have a problem." (Tr. 109.) Roy described the ESU team as being all over the house. He saw Jason Gabriel being walked out of the Residence. While Roy initially referred to his son being "dragged" out of the house, he corrected his testimony to say that he saw Jason "walking out the door outside into the driveway." (Tr. 109.) Roy stated that after approximately twenty minutes to a half-hour, Jason came back into the Residence with another man in a suit. The person in the suit was heard by Roy to have said "all right guys. We have no need to be here no more. Let's go." After this statement, they (presumably the ESU team) all left the Residence. (Tr. 109.) Roy stated that while he was handcuffed, he felt that he was not free to leave the Residence. (Tr. 112.) During the time that Jason Gabriel was outside of the Residence, Roy saw that Gabriel was talking with officers, but could not overhear any part of any conversation. (Tr. 115.) He did observe, however, that Gabriel was not handcuffed and looked to have been acting cooperatively. (Tr. 115.) Roy knew that Gabriel was arrested in the past, but was unaware of the details of any those arrests. (Tr. 115.) He

10

specifically denied knowledge as to any arrests or convictions with respect to sexual abuse or stalking. (Tr. 116-17.)

When asked whether the Residence was searched, Roy stated that no search whatsoever was conducted. (Tr. 110.) He knew this because, although he was on the couch in the living room, he later saw that nothing in any room was moved, and nothing was taken. (Tr. 110.) He mentioned, in particular, that no laptops or computers belonging to any member of the household were taken. (Tr. 110.) Roy stated that old cellphones were stored in the Residence. While some may have been in the bathroom, he was not specifically aware of them, and stated that he was not aware that any cellphones were taken in connection with execution of the Warrant. (Tr. 114.)

II.     Gabriel's Declaration

Gabriel did not testify at the hearing. However, prior thereto, he submitted his declaration. (DE [24-2] (Declaration of Jason Gabriel dated July 12, 2022) ("Gabriel Decl.").) Therein, Gabriel states that on the morning of November 19, 2020, he was in the bathroom of the Residence. (Gabriel Decl. ¶ 2.) He states that he was pulled out of the bathroom by law enforcement officers, handcuffed and taken outside. (Id.) Gabriel states that when he was told to leave his house, he was not fully dressed and was told that he could not go back into his house to get the rest of his clothes. He states that he was informed that he had to wait for a detective, told that he must "comply" and that he could not leave the yard. (Id.) Gabriel's declaration states that he does not remember signing anything "except maybe some pictures. (Id.)

Gabriel's declaration further states that he was advised by counsel that his declaration was submitted for a limited purpose. He therefore states that he did not include therein everything that happened on the day of his questioning. (Gabriel Decl. ¶ 3.) Finally, Gabriel

11

states that his declaration was written by his attorney with information provided by Gabriel to the best of his recollection. (Gabriel Decl. ¶ 4.)

## ANALYSIS

I.  Legal Principles

Warnings deemed necessary pursuant to Miranda v. Arizona, 384 U.S. 436, 444 (1966), are required when an interaction with law enforcement is deemed a "custodial interrogation." This determination has two parts: (a) whether there was an "interrogation" of the person, and (b) whether that interrogation took place while they were in "custody." Cruz v. Miller, 255 F.3d 77, 80-81 (2d Cir. 2001). "[I]f a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a 'prerequisit[e]' to the statement's admissibility as evidence in the Government's case in chief, that the defendant 'voluntarily, knowingly and intelligently' waived his rights." J.D.B. v. N. Carolina, 564 U.S. 261, 269-70 (2011) (quoting Miranda, 384 U.S., at 444, 475-476)) (alteration in original). No party suggests that this case raises the question of whether Defendant was interrogated. Instead, the only questions here are whether or not Defendant was in custody at the time of the interrogation (requiring Miranda warnings) and, if those warning were required, whether Defendant knowing and voluntarily waived his rights.

A.  Custody

The definition of "custody," for Miranda purposes, is not "coterminous with, though it is often informed by, the colloquial understanding of custody." United States v. FNU LNU, 653 F.3d 144, 152-53 (2d Cir. 2011). When determining whether an individual is in "custody," the "overarching" question is whether "a reasonable [person] in the suspect's position would have understood" themselves to be "subjected to restraints comparable to those associated with a formal arrest." FNU LNU, 653 F.3d at 153 (quoting Georgison v. Donelli, 588 F.3d 145,

12

155 (2d Cir. 2009) (additional citation and internal quotation marks omitted) (alteration in original; see also United States v. Yilmaz, 508 F. App'x. 49, 51 (2d Cir. 2013). Generally, the custody issue is considered through an objective lens, and not one that is subjective. See United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016) (noting that "an individual's subjective belief about his or her status generally does not bear on the custody analysis"). Similarly, the officer's perception is not dispositive of the issue, "although an officer's knowledge . . . 'may bear on the custody issue if they are conveyed, by word or deed, to the individual being questioned.'" Id. (quoting Stansbury v. California, 511 U.S. 318, 325 (1994)).

Factors to consider in making the custody determination include the place of interrogation (including whether it took place in or out of the public's view), the duration thereof, whether the defendant volunteer to be interviewed, the use of restraints, the presence of weapons (including whether such weapons were drawn or not), whether the defendant was told that they were free to leave or under suspicion, the nature of the questions asked, and, in the case of a juvenile suspect, the individual's age, if known to the officer or readily apparent. See FNU LNU, 653 F.3d at 154-55; Faux, 828 F.3d at 135.

Because the question of custodial interrogation requires an objective analysis, a reasonable person's expectations as to how the questioning is likely to unfold is relevant. Thus, for example, questioning in connection with a short traffic stop is generally not considered custodial. In such a situation, the interaction with law enforcement is expected to be brief and limited to matters related only to driving. Therefore, the individual questioned would not reasonably think that they are in custody. See Berkemer, 468 U.S. at 437-38; see also United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004).

The fact that an interrogation takes place in a home is significant, but not dispositive. See United States v. Familetti, 878 F.3d 53, 60 (2d Cir. 2017) ("[I]nterrogation in the familiar surroundings of one's own home is generally not deemed custodial.") (quoting United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004)). Where questioning takes place in the suspect's home, the conversation is cooperative, the suspect is told that they are not under arrest and can ask to leave at any time, a non-custodial holding will generally follow. E.g., Familetti, 878 F.3d at 60. On the other hand, in-home questioning that is accompanied by the use of handcuffs, advising the suspect that they are under arrest, and the presence of several members of law enforcement, may result in a holding of custodial interrogation. See generally Faux, 828 F.3d at 135-36.

B.   Waiver

Miranda rights may of course be waived. Such waiver must, however, be knowing and voluntary. With respect to this issue, the government must show, by a preponderance of the evidence, that the defendant relinquished their rights voluntarily and that they had a full awareness of the rights being waived. Such waiver must have been "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Colorado v. Connelly, 479 U.S. 157, 170 (1986) (quoting Moran v Burbine, 475 U.S. 412, 421 (1986)). The question of whether consent was voluntary is a question of fact. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1974). "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Id.

When determining whether a person acted voluntarily, courts consider the "totality of all the circumstances," United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (citation and

14

internal quotation marks omitted), including "both the characteristics of the accused and the details of the interrogation." Schneckloth, 412 U.S. at 226. Courts consider whether there were "subtly coercive police questions" and the "possibly vulnerable subjective state of the person who consents." United States v. Oken, No. 19-CR- 492, 2022 WL 4121142, at *4 (E.D.N.Y. Sept. 9, 2022) (quoting Gem Fin. Serv., Inc. v. City of New York, 298 F. Supp. 3d 464, 487 (E.D.N.Y. 2018) (additional citation omitted). Among other "nonexclusive factors" are the age, education and intelligence of the defendant, the length of detention, whether there was "repeated and prolonged" questioning, whether the defendant was restrained, whether there was a show of force, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent. Oken, 2022 WL 4121142, at *4 (citations omitted); see also Schneckloth, 412 U.S. at 226; United States v. Garcia, 554 F. Supp. 3d 421, 429 (E.D.N.Y. 2021), appeal withdrawn, No. 21-2153, 2021 WL 7367169 (2d Cir. Dec. 7, 2021); United States v. Schaefer, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012).

II.   Disposition of the Motion

The issues before this Court are whether Gabriel was in custody at the time of the execution of the warrant and, if so, whether he knowingly and voluntarily waived his rights with respect to the making of any statements at that time.

A.   Gabriel Was in Custody

The Government argues that Gabriel was never in custody within the meaning of the Fifth Amendment. In support of its position, the Government relies on the facts that Gabriel was never handcuffed or restrained and voluntarily met with Gonzales in his police vehicle. Once in Gonzales's vehicle, Gabriel remained there unrestrained and no formal arrest was made. However, there is no question but that the entry to the Residence made by the ESU, which was

described by Detective Gonzales as "tactical" and "dynamic," presented a sudden, jarring and likely frightening situation for all members of the household. While Gabriel was not handcuffed, and exited the Residence willingly with Gonzales, he did so while the rest of his family was in handcuffs and restrained. All questioning took place inside Gonzales's police vehicle outside of the public view, and that of Defendant's family.

The facts that Gabriel willingly exited the Residence (unrestrained) and remained in the police vehicle weighs against any finding of custody. However, the length of the interrogation weighs in favor of a finding that Gabriel was in custody. Gabriel was in Gonzales's vehicle for a period of approximately one and one-half hours and then was turned over to Detective Bishop for further questioning. This fact distinguishes this case from those finding an absence of custodial interrogation where a defendant is asked to answer a few questions and told that they were not under any suspicion. Here, as the length of the interrogation grew, so too did Gonzales's indication that the evidence against Gabriel was mounting, and a reasonable objective belief that he was not free to leave. Over the course of the interview by Gonzales, Gabriel was repeatedly told that the search revealed growing evidence that the police were finding evidence of child pornography on cell phones located in the Residence. Under all of the circumstances here, a reasonable person would expect that he was in custody. See FNU LNU, 653 F.3d at 154-55.

The Government relies heavily on cases holding that questioning in the "familiar surroundings of one's own home" rarely leads to a finding of custody. E.g. Familetti, 878 F.3d at 60. Here, however, Gabriel was not questioned inside his home, but was led outside by Detective Gonzales and questioned inside a police vehicle for over an hour before being handed over to a second detective for questioning. While the facts here are close, and certain factors weigh against

16

a finding that Gabriel was in custody, this Court finds, as a matter of fact, that Gabriel was indeed in custody at the time of questioning by Gonzales and Bishop. Accordingly, the requirement that Miranda rights be given was triggered. For Defendant's statements to be used in the Government's case in chief, Gabriel must have waived those rights. The Court therefore turns to the next issue, i.e., whether Jason Gabriel validly waived his rights.

      B.      Gabriel Voluntarily Waived His Miranda Rights

Factors discussed by Courts deciding the issue of waiver include, as described above:

- the defendant's age, education, and intelligence;
- the length of detention;
- whether the defendant was restrained;
- whether there was a show of force;
- defendant's knowledge of his right to refuse (including, where appropriate, defendant's prior involvement with the criminal justice system); and,
- defendant's previous refusals to respond to questioning prior to the waiver.

Here, consideration of these factors leads to a clear and unmistakable finding that Gabriel waived his rights.

At the time of the Warrant's execution, Gabriel was thirty-five years old. He was certainly old enough to understand the meaning of the waivers. Gabriel's experience with the criminal justice system reaches back to the age of seventeen and includes the conviction that led to the requirement that he register as a sex offender. Gabriel was unrestrained when he executed not one, but two, clear and explicit waivers of rights. The waivers include not only "checkoff" boxes, but narratives detailing his discussions with the detectives. That Gabriel read these

narratives is evidenced not only by his initials and signatures, but also by his decision to edit the narrative in the First Waiver of Rights. While Gabriel's pre-hearing declaration indicates that he did not remember signing anything (except for perhaps the photographs), the Court credits the testimonies of Detectives Gonzales and Bishop that are directly to the contrary. Both detectives testified credibly at the hearing and the Court accepts their testimony over the pre-hearing declaration submitted by Gabriel. See United States v. Choudhry, 24 F. Supp. 3d 273, n.1 (E.D.N.Y. 2014) (noting that while a defendant's decision not to testify at a suppression hearing may not be held against him, "his hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much in the absence of corroboration, whether from the defendant or otherwise") (quoting United States v. Thompson, No. 10-CR-94, 2010 WL 3069668 at *5 n.1 (S.D.N.Y. July 29, 2010)). While Roy Gabriel did testify at the hearing, his testimony was limited to what occurred inside the Residence. He was not present during Gabriel's interviews and any discussions with the detectives were well out of his earshot.

In sum, upon review of the testimony and exhibits presented at the hearing, this Court finds that Gabriel voluntarily waived his Miranda rights. Waivers occurred when he was in Gonzales's police vehicle and again when he chose to speak with Detective Bishop. The waivers are specific and complete. Not only did Detectives Gonzales and Bishop speak with Gabriel about his rights, each detective went over the written statements of such rights. Gabriel expressed his waiver of rights in conversation and again, unquestionably, in writing. Gabriel also reviewed detailed written statements as to the substance of each interview. This Court finds that the credible testimony of Detectives Gonzales and Bishop, as well as the written statements of

waiver presented at the hearing, establish a clear and unequivocal waiver of Gabriel's <u>Miranda</u> rights.

## RECOMMENDATION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion to suppress be denied.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to all parties by electronic filing. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within the specified time waives the right to appeal both before the district and appellate courts. <u>See</u> 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59; <u>United States v. Ballares</u>, 317 App'x 36, 37-38 (2d Cir. 2008).

**SO ORDERED.**

Dated:  Central Islip, New York
          February 9, 2023

                                                       /s/ Anne Y. Shields
                                                       Anne Y. Shields
                                                       United States Magistrate Judge